Okay, next case we'll hear is the last case of the day, Gillis v. Respond Power. Good morning, your honors. My name is Michael Donovan, may it please the court. I represent the plaintiffs in this matter, and I'd like to reserve three minutes for rebuttal. That'll be grand. Your honors, the key issue in this Rule 23F appeal is whether the district court was mistaken about substantive Pennsylvania law. Because this case was removed from state court to federal court under the Class Action Fairness Act, the trial court was obligated, under the rules of the Decision Act and the Rules Enabling Act, to faithfully follow and apply Pennsylvania law. If the trial court was mistaken about Pennsylvania law, then it necessarily abused its discretion in denying class certification and should be reversed. What's the most significant error that the district court made? You know, your honor, I'm not going to characterize them as most significant because I think there are three equal errors. Okay. First, the district court ignored controlling law as expressed in my own case, Samuel Bassett v. Kia Motors America. There, the Pennsylvania Supreme Court held without any doubt that a contract binds the writer of the contract, regardless of whether the consumer read, understood, or even considered the contract. In addition, the court there said that the meaning of the contract should be gleaned from the words of the contract, regardless of whatever else is used to describe the contract. A similar Supreme Court case is reflected in our brief. It's called Insurance Adjustment Bureau v. Allstate Insurance. Even better case than that, standing for the same proposition though, if our job is to predict what the Pennsylvania Supreme Court would do, is the State Farm Insurance case, which is a subrogation case against PICO. And I say that's a better case for two reasons. One, it involves a utility contract, which is what we have here. Two, the concurring opinion discusses all of the authorities that we think are controlling here. And that concurring opinion was written by Judge Wecht, now Pennsylvania Justice Wecht. And he goes there into the proper application of parole evidence in the context of an adhesion contract. In that case it was a PICO tariff, but he analyzes it in the context of PA contractual law. And there he says, because we're dealing with a consumer adhesion contract, you must apply the rule that the drafting party has the contract construed against it. And that should be applied if there's an ambiguity. Here we think the district court's first fundamental error is that it inverted the analysis. What it did was instead of going to what we say is the contract here, the price term here, and ascertaining what the plain meaning was, it looked at the deposition testimony first. And this court itself has already said, in an unpublished opinion that we cite, that that's wrong. You can't do that. But counsel, in fairness, it can be said that the judge found that the disclosure statement was not ambiguous. And there's a language that says, even if it were ambiguous, then whatever it is. You seem to be fixing it on the second part. Didn't they do both and she just had an alternative, came up with two alternatives? In fairness, she could read her opinion that way. And so let me go back to the first part. If the court did, and because we're at a 23-F appeal here, Your Honor, and I think that's a very good point. If the court did determine this on a plain meaning basis, Clash has to be certified because it's the same contract for 50,000 people. If we're to lose because we represent 50,000 stupid people, then we should lose for all 50,000 if that's what the plain meaning of the contract is. We believe that the plain meaning of the contract is not that. We believe that the plain meaning of the contract is that it's a meet or beat clause. We believe that as a meet or beat clause, in other words, the way this pricing term is described as a variable rate, it says our goal is to obtain savings, but we can't obtain savings all the time without ever disclosing that the rate can exceed the local utility. But you see, this is an interesting case, and it could have far-reaching implications. This judge obviously thought that you didn't like your case at all. Correct. All right? I agree. I think we can go that far. But, I mean, and you complained a little bit about, well, at this stage, in this certification stage, she acted inappropriately. She went too far. She went into the merits to say, look, there's no breach of contract here, basically. You could say that, I guess. Yes, I agree. But, I mean, what would you have her do? I mean, would you have her just say, all right, we'll certify it, and later on I'll tell you my true feelings? I mean, two answers to that. And that's the valid question, Your Honor. There are two answers. She could have either done a motion to dismiss, but she moved the motion to dismiss and said, I'm going to do the class cert first. Or she could have ordered some of the judgment proceedings. And, in fact, this court just two days ago, in footnote 34 of the Mondefino decision, it's page 62, said, let me quote, and this court was quoting the Tyson Foods Court, the Supreme Court decision just recently. And, of course, I'm probably telling you stuff that you, Your Honors, are already familiar with. But let me just get it in the record. The quote is, when, as here, the concern about the proposed class is not that it exhibits some fatal dissimilarity, but rather a fatal similarity and alleged failure proof as to an element of plaintiff's cause of action. Courts should engage that question as a matter of summary judgment, not as a matter of class certification. So let me just follow up on what Judge Shigera suggested. If we were to send it back and the judge, it would be a different judge, obviously, but if we send it back and it's going to be assigned to a different judge, and that judge says, okay, we're going to deal with summary judgment right now, or 12B6 right now, how would that advance the ball? Well, it would advance the ball this way, Your Honor. One, if you're going to send it back, we submit that you should reverse certify the class and send it back. The class was fully briefed, and there really is no dispute that this is a common predominating question about what this contract price term means. It applies to everybody. If, in fact, we're wrong, and that means 50,000 Pennsylvania consumers were mistaken or entered into a bad deal, or in our view, were not mistaken, they were duped by the very contract language that we relied upon here, then we can then, on summary judgment, and we will submit on, if the court says there's no ambiguity, okay, well, we're going to decide it on the plain language. And then that will be a right case for this court to decide on that plain language. If, however, but we're on a 23-F here, so I don't think this court properly can reach that. You wouldn't think you should because that exposes, I just don't think you should. It would be bad law. So if, however, the court goes down, and it sends us down, and we're going to then have a summary judgment briefing, well, we want to bring in all the rest of the flyers, the telemarketing scripts, and everything else to show that this is exactly how they portrayed it to all of our clients. You should look at the meaning of an ambiguous contract, not from what any person who read it thought it meant, but from what the defendant thought it meant because they were the drafter. If you're going to consider those things, I would submit on a summary judgment, we're going to win because all those things portray this price term as a meet-or-beat term. The key reason why this price term is a meet-or-beat term is because their own general counsel admitted, on the record, and it's in the joint appendix, that Respond never disclosed to any consumer that the price of the electricity could exceed the local utility price. They never said that. Now, this is a variable rate. The only way you can interpret this price term to be other than a meet-or-beat is to say the word variable of necessity to 50,000 people meant either you're too stupid to know that that can't vary above or it meant our meeting. Our point was if you're portraying a variable rate without disclosing that it could vary above the local utility, then you are portraying a meet-or-beat price because there's no reason anybody would switch. By omitting the key caveat that this can go above the local utility, and let me point out, we're in a deregulated environment, so the local utility rates can also vary. They're also in the stock market. So the way this price term is portrayed is it's a meet-or-beat term. That's how 50,000 people fell for the deal. Okay, I'm going to help you because I feel like I'm in a play. You're in a soliloquy, and I want to have a conversation. Oh, I'm sorry. That's not my job. Okay. I saw Hamilton, so what can I tell you? There's so many things to say to that. Okay, three equal errors. You were in the middle of one when you were given a great question. Just list them. Don't give me the because then I have other questions. Okay. What's the second one? And then give me the third one. The second one. The first one was ignoring Pennsylvania law and relying on deposition testimony. The second one was inverting the analysis. In other words, using the parole evidence before plain meaning. And the third one was violating the Rules Enabling Act by misapplying Pennsylvania law to deny class certification. In other words, expanding the defendant's defenses beyond what Pennsylvania law allows. Because if you say, well, one of the defendant's defenses is that they can rely on what the consumers believed, you are changing Pennsylvania law, which says you can't. And by doing that in the Rule 23 context, you violate the Rules Enabling Act. That's our point. Part of your argument is quarreling with the rigorous analysis. Well, first of all, is rigorous analysis a sufficient deficit in the opinion for us to, on that basis alone, reverse? Or is it just part of the mix? I think, in fairness and honor, it's part of the mix. For one, the court doesn't really even talk about a rigorous analysis. But even if it did, it misunderstood the role of consumer testimony in this context. So it falls right into the Reyes category. If the court misunderstands the application of consumer testimony in the legal context, then it necessarily fails the rigorous analysis, as this court itself described in the Reyes opinion. And the reason I say that is because here it made no difference whether any of our clients or any 50,000 people ever read the disclosure statement. Because the PA Supreme Court says that makes no difference. So hence, it can't make a difference at Rule 23. And here's what the court ought to be thinking about. If we were in the court of common pleas, which is really what we're replicating here, because it should be the PA Superior Court. If we're in the court of common pleas, when we go in and say, oh, well, the plaintiff's going to testify about what they understood the meaning of the contract to be, the court of common pleas is going to say, no, no, no way, not happening. I don't care if it's a class action or not. They're not testifying about what they believed it to be. The whole point of what this means is what the defendant said it was, if I can't determine that from the plain meaning, will there be other things the defendant said it meant out there? Flyers, telemarketing slips, and things like that. So would you say it's a question of law whether it's ambiguous or not ambiguous? It is. But once you decide it is ambiguous, that's a fact question. And if it is ambiguous, you don't look at it from the consumer's perspective. You look at it from what the defendant said it meant. And you also apply the rule that you construed against the drafter, and that's that State Farm decision, Judge Wackton, now Justice Wackton. So I have some time to reserve. Thank you. Unless you have any other questions. Anything else? Well, I want to ask you about the absence of any discussion of the implied covenant of good faith and fair dealing. But you can just think about that and give it to us on rebuttal. All right. Thank you. May it please the Court, Your Honors. My name is David King. I'm with the law firm of Eric Feinstein, and we represent the defendant and the appellee respond power LLC here today. I had a fairly lengthy outline that I spent significant hours poring over, preparing myself for this argument. And as is often the case, we've gone in completely different directions than I expected. So I'm going to bootleg here. Let me just start where Mr. Donovan is starting. Did the judge, did the district court correctly apply Pennsylvania law? Absolutely, Your Honor. I don't think there's any doubt about it. I think the issue, as I understand what Mr. Donovan is saying, is that the court essentially committed error when it looked at the testimony of the customers or the consumers in this particular case who were deposed to try to figure out what they understood the contract to mean, as opposed to simply taking the contract and applying the putative or the purported ambiguity directly against my client respond power. But the problem with that is that that's not the law of Pennsylvania. Pennsylvania does not immediately resort to the rule of contra preferentum against the drafter of a contract. And I'll point you, Your Honors, to the case of Burns Manufacturing v. Bain, which is cited in our papers. That's from the Supreme Court in 1975 in Pennsylvania. They in fact, that court in fact noted that rules of construction, like contra preferentum, are not intended to serve, and this is a quote, as a talismanic solution to the construction of ambiguous language. Inquiry should always be made into the circumstances surrounding the execution of the document. And it's only when such an inquiry fails that you then resort to a rule of construction. Well, isn't the problem that the judge was looking at whether those customers had common answers rather than really looking at the notion or the theorem of commonality? That is, are there rather common questions of law or fact? Your Honor, I think when you look at hydrogen peroxide, the point of the hydrogen peroxide decision, as I understand it, is in any case plaintiffs could come forward to the court and say, look, there's all these common issues and common questions. It's very easy to identify common issues and common questions. The inquiry actually focuses on whether or not you can establish common answers through common evidence. In other words, you look ahead. The district court's job is essentially at the certification stage. It's kind of like a gatekeeper function on a Daubert motion. They're looking ahead and imagining or trying to understand what a trial in a class action context would be like and what evidence would go in front of the court in that process. And if there is common evidence at that stage, then it's appropriate to certify a class action. If, however, at that stage, because of the varying defenses or the varying issues or differences between the class members, there's going to require the submission of evidence for each and every customer, then class action is not appropriate. It's hard to look at this situation and come to a conclusion that, you know, that there are going to be thousands of different answers, other than the fact that there are 50,000 people. I mean, you know, there's a finite number of answers. I mean, the solicitors or I'm sorry, the solicitations and other, you know, advertisements and ways that the company got their word out, there's certainly a commonality. So there's going to be a commonality among the customers as to how they're going to view this. It's a fair point. I'm sorry. I'm so sorry. Go ahead. It's a fair point, Your Honor. But I think the real point is that there might only be five or 10 or 15 different variations as to how the customers understood the agreement. But the point is to identify where the customers fit in those five, 10, or 15 categories, you're going to have to examine each and every one of those customers to hear what the sales agent said when they came to the door and talked with them. Now, your adversary says you got it wrong. Your adversary says look at it from the defense point of view, not from each one of these plaintiffs. How do you respond to that? That's fine, Your Honor. I think that accepting the plaintiff's argument on its face, it actually cuts against the plaintiff. Because if you're going to look at what the defendant had to say about the understanding of these terms, you're not just going to look at a flyer. You're going to look at the sales pitches. You're going to have to go to the individual interactions between the customers and the company. Let's follow that, though. Your adversary mentioned the Montefiore case, and I expressed some concern about a judge right up front here basically determining the case on the merits. Shouldn't they be given a chance to have the process of summary judgment to make that kind of determination? Your Honor, there will be a summary judgment motion when we go back to the district court level on the individual class member's claims, for sure. If the question is should they get summary judgment decided before certification, I think that what perhaps has happened here is we've kind of read the judge's decision below in a way differently than I would read it. I look at the judge as looking at the contract provision in question and certainly saying on its face it doesn't seem to support what the plaintiffs are saying. However, as I think you pointed out in your questioning, she says even if you assume this might be ambiguous, let's take the example of if this provision is ambiguous, what happens there? Can we certify the case? So she explored the issue thoroughly from the point of looking at this as if it were ambiguous. She did not prejudge or predetermine that the contract says what we say it says. If we affirm here, aren't we really reversing net deposit? I mean, with regard to what we set out there regarding rigorous analysis? Not at all, Your Honor. I think this qualifies as a rigorous analysis. I think you have a judge with the record that she was given on the certification motion, with testimony from each of the class members, with testimony from the general counsel of the defendant and another executive of the defendant. She's had an opportunity in exploring the ambiguity to weigh that evidence and determine not the outcome of the case but what evidence would be required at a trial of the matter, which is really what her job was on a certification motion. And after that rigorous analysis, and by the way, following decisions from the Eighth Circuit and from courts around the country, said it doesn't matter if you have a form contract if the provision in the form contract is ambiguous because once you get to the ambiguous provision, then you have to start looking at the reasonable expectations of the parties. And to do that, you've got to look at the circumstances surrounding the individual transactions. It becomes a trial of 50,000 people. Well, let me ask you this. How does it become a trial of or why should it become a trial of 50,000 people? I mean this much. Tell me if I'm right about this. There are uniform scripts and presentations by the respond reps, right? And there were uniform scripts prepared for the representatives. That's correct, sir. Okay. So why don't we start there with the notion that the 50,000 customers were enticed might be a bad word from our perspective, but confronted with uniform scripts and presentations. Your Honor, we can't jump to that conclusion because we do have the benefit of the testimony of the class representatives in this case, as did Judge Shapiro. And the testimony of the class representatives demonstrates that they had a completely different sales experience just among the two reps that we've seen so far in the case from each other. There was not a common scheme. As you can imagine, on any door-to-door sales pitch, the representative may have bullet points that they want to cover, but in the interactions with the customer there are going to be different issues that are coming out in every such communication. There's going to be customers, for instance, who are going to ask the representative, will you guys charge me more than my utility? And then the representative is going to have either answer that question, and it can happen depending on market fluctuations, or if it's a rogue representative, they might lie and say that can't happen. But my point is you're always going to – But that would be true in any sales case, right? Yeah, which is why when you have situations involving these form contracts, I think you can see from the briefing there's two sets, essentially, of decisions here, right? There's a split, and some of the cases have gone the plainest way and said, hey, when you have a form contract, that's all you need to worry about. You can certify the class. And then the other set of cases, the ones that we like, have looked into it a little deeper and evaluated it and said, well, if you have an ambiguity and you have an issue where you have to look at the individual circumstances, then that defeats commonality. It defeats predominance, and we can't go forward with the class. I mean, I think it's really important, by the way, in looking at these two sets of cases, in my view there's a very clear way to harmonize them, and I think the Eighth Circuit did it in the Averitt v. Reliostar case that we cited. And, by the way, that's the only court of appeals decision that's looked at this issue, and it comes out our way. I think what you have to do, and taking this from the Averitt case, is you have to look, first of all, and see is there an ambiguity? And here, certainly, the argument is that there's an ambiguity. That's what the plaintiffs have argued, in fact, in their brief on certification. But once you find the ambiguity, then you have to take another step and say, is there common evidence in the face of the ambiguity that's going to resolve this issue, or are we going to have issues where we have to hear about each individual circumstance? So the plaintiffs are very excited about the Zeno case, from the Western District of Pennsylvania, and in truth it probably is the strongest case they've offered to support their view of the outcome here. But when you look at the Zeno case, it's completely in harmony with Averitt. It's completely in harmony with our position. What happened in the Zeno case is you had admissions and deposition testimony from Ford executives that, in fact, completely undercut and eliminated the need to go to individual sales experiences. That was a case where radiators were supposed to be installed in trucks based on the size, based on whether they ordered a towing package. If you ordered a towing package, you were supposed to get a bigger radiator. And Ford had not put in larger radiators in the class representative's truck and in a number of people in the class. Well, there was testimony from a Ford executive in the Zeno case that said, we can't say this is a missale. This was a mistake by the company. Which stage was the case at that you're citing from? That was a certification motion. Okay. That was a certification motion. The court was determining whether or not it could certify the class. All right. And it did, I believe. So my point is that you can harmonize these two lines of cases. And really the question is not whether or not you have a form contract, because all these cases have form contracts. It's, is there an ambiguity, because some of the plaintiff's cases don't even involve situations where there's ambiguities. So, of course, you're going to be able to certify a form contract where there's no ambiguity. And then the deeper question, if there is an ambiguity, the deeper question is, can you resolve that ambiguity through common evidence, as hydrogen peroxide requires, or are you going to have to go and conduct an individual inquiry into all of the individual circumstances? The Abbott case is on all fours with our decision, with our issue here. It's a situation, by the way, where the district court had looked at the provision and said, I don't buy, I don't buy what you're saying, plaintiff. This contract does not say what you're saying. But at best it could be ambiguous. So let's look at the ambiguous. Let's treat it as ambiguous. So your adversary pointed out, look, we all know we've got this closure statement. I guess that's what we all consider to be the contract in this case? It's the boilerplate language, Your Honor, that comes with the plaintiff's front page. So it's the other stuff, you know, the representations and all. Is that even relevant? I mean, it might be relevant to a fraud claim, but is it relevant to a breach of contract claim, which is what we're looking at? Absolutely, Your Honor. It's only relevant. The material outside of the four corners of the contract is only relevant if there's an ambiguity. It's ambiguous. Right. Did she make a point? Did she make a specific finding with ambiguity? She made a finding, Your Honor, that she made a finding that the plaintiff's interpretation of the contract was not unambiguously correct. No, she said implausible, didn't she? She used the term implausible, but she looked at the agreement and said, I can't, from this agreement, say that the plaintiffs have unambiguously identified how this term should be applied. It's not unambiguously, as he puts it, a meet or beat provision. So she went into the ambiguity analysis, and that's where she determined, following the guidance from hydrogen peroxide, she determined that this was going to be a case that would require many trials just on the issue of commonality. But it also raises the issue, Your Honor, we haven't even talked about typicality or adequacy, which were separate bases for her decision. You have testimony from these class representatives that make it clear that they did not interpret the contract this way. So even if you were to agree or disagree with her decision on commonality, you have the hurdle of typicality where these particular class reps are subject to additional defenses that other members of the class might not be. Did the court drop the ball on implied covenant of good faith and fair dealing? Not at all, Your Honor. In my view of the implied covenant claim, it's almost like a vestigial organ in this case. This case started out as a fraud case. It did. If you look at the original complaint, there was no breach of contract claim in it. When it was removed, the fraud claim stayed in there. You'll notice that they're not here on certification. The plaintiffs decided that they could not certify their fraud claims. The breach of covenant claim is essentially a disguised fraud claim. You know, when you look at the implied covenant, it's supposed to be something that cannot conflict with the express terms of the contract. There is a pricing provision in the contract. You can't replace that with an implied covenant. Either we're right or they're right. Either way, you can't come in and fault the defendant under the implied covenant and give them relief in that manner. But did the district court deal with it? I understand your position. She didn't deal with it. That's the question. No, she certainly addressed implied covenant in the decision. In discussing the plaintiff's claim, she noted it was there. I agree with you. She didn't spend a lot of time on it. No doubt about that. Well, I guess in commonality she mentioned it. Yes. Thank you. Judge Greenway, are you satisfied on the implied covenant? You wanted me to deal with it. Wow, I've never had anybody say anything like that. I'm going to say I'm not satisfied. Okay, great. She did not address it, and I think that's error. I think the rigorous analysis, as you and I were both discussing before, required that the court examine both causes of action. We expressly raised it. I don't think it's a vestige at all. I think it's an important component of our claims here. And let me explain what the implied covenant claim really is. It's that this price term says that our goal is to do this, keep you under the local utility rate. We say they breached that duty of good faith and fair dealing, not in how they portrayed it originally, but in how they went about obtaining the price because they never used what would be good faith and fair dealing, hedges, other means to avoid price spikes that would take you over the local utility rate. And therefore, we think that is a violation of the duty of good faith and fair dealing that applies to everyone. Again, since it's common, since our clients have the same theory, and since they're clearly adequate, it should have been certified. Let me address the point about why this case in particular, Larry, cries out for a look at Samuel Bassett. Counsel was talking about, well, you're going to have to look at what these consumers understood, read, what they perceived from all of the solicitors. The Pennsylvania Supreme Court's already answered that in a warranty context. There's thousands of warranties there. The court didn't care what anybody understood, whether they read the warranty booklet or didn't read the warranty booklet. If the warranty booklet was ambiguous, and there were certain ambiguities in that, it was constrained against the drafter there, which is what State Farm says. If it was ambiguous, you didn't look at it from, oh, what did Mrs. Jones think the warranty meant on Saturday before she talked to her husband on Monday? Because you can't understand a contract that way. You can't understand it by giving 50,000 different impressions of what they remembered two years ago. That's not how courts do it. They look at it from a common uniform perspective that's consistent with race, consistent with hydrogen peroxide, and what perspective is that? The defendant's own words, we never disclosed to anyone that we could charge higher than the local utility rate. The Averitt case that he mentioned, I don't think the court needs to even look at the Eighth Circuit decision. Why? Because it's a standing case that this Third Circuit has rejected the whole principles that Averitt discusses. It's rejected it emphatically multiple times, saying the standing question is only for the class representative. So, Averitt, you couldn't even cite it because it would be contrary to all of your authority. Anything else, your honors? Thank you, counsel. Thank you very much. Thank you. We'll take a case under advisement. Ms. Morrow, if you could adjourn court.